# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **MICHANGELO SCRUGGS** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **Case No.: 1:07-cv-02255 JDB** |
| **v.** | : | |
| | : | |
| **GETINGE USA, INC.** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## DEFENDANT'S SUPPLEMENTAL EXPERT
## WITNESS DESIGNATION STATEMENT

Defendant Getinge, USA, by and through undersigned counsel, and pursuant to Fed. R.

Civ. P. 26(A)(2) respectfully requests leave to submit this supplemental expert witness

designation statement to include the reports of William Daley attached as Exhibit A and Dr. Paul

Fedio attached as Exhibit B. In addition, this supplemental statement includes the fee schedule

for Dr. Fedio attached as Exhibit C and a list of case appearances for Dr. Lewis Levitt attached

as Exhibit D.

Respectfully submitted,

**JORDAN COYNE & SAVITS, L.L.P.**


By: _____/s/_____
D. Stephenson Schwinn, #358835
100 Connecticut Avenue, NW
Suite 600
Washington, DC 20036
(202)296-4747
Fax: (202)496-2800
Counsel for Defendant, Getinge USA, Inc.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on the 29th Day of August, 2008, a copy of the foregoing

Supplemental Expert Witness Designation Statement was filed electronically electronically and

was mailed, postage prepaid, to:

Joseph Cammarata, Esquire
Chaikin, Sherman, Cammarata, & Siegel
The Law Building
1232 17th Street, N.W.
Washington, D.C. 20036


_____/s/_____
D. Stephenson Schwinn

A

# Scruggs v. Getinge USA Investigation

**William H. Daley, III, P.E.**
**Mechanical Engineer**

**August 29, 2008**

**CED Case No. 7154.1**

## CED INVESTIGATIVE TECHNOLOGIES, INC.

## Table of Contents

Introduction ................................................................................................................ 1

Background ................................................................................................................ 1

Investigation ............................................................................................................. 2

Discussion................................................................................................................. 11

Conclusions .............................................................................................................. 16

Attachment A - Photographs

Attachment B - Figures

## Scruggs v. Getinge USA Investigation
## CED Case No. 7154.1

### Introduction

On March 28, 2008 CED Investigative Technologies, Inc. (CED) was asked to perform an investigation and analysis in a personal injury accident involving a surgical light fixture located in a hospital operating room. A surgical resident at the hospital was injured when an operating room light fixture fell from the operating room's ceiling. The purpose of the CED investigation was to determine what caused and/or contributed to this accident.

### Background

On August 29, 2006, Dr. Michangelo Scruggs was employed as a post graduate resident in the podiatric medicine and surgery residency program at Howard University Hospital (Howard) located in Washington, D.C. As part of his duties, Dr. Scruggs would assist in various podiatric surgeries at Howard. On the day of his accident, Dr. Scruggs was reportedly attempting to adjust a surgical light fixture that was hung from the ceiling in one of the operating rooms at Howard when the fixture somehow fell from the ceiling, striking Dr. Scruggs. Dr. Scruggs was injured as a result of this accident.

The light fixture involved in Dr. Scruggs' accident was manufactured by MDT Castle Model L2031, Serial No. JKM85115. At some point the manufacturer of the light fixture involved in Dr. Scruggs' accident, MDT Castle, was purchased by Getinge USA, Inc. (Getinge).

Page 2  Scruggs v. Getinge USA Investigation - CED Case No. 7154.1

<u>Investigation</u>

CED's investigation included a review of the following written materials:

1.  Depositions:

    (a) Mr. Phillip Sax, dated May 27, 2008,

    (b) Mr. David Clauss, dated April 17, 2008,

    (c) Mr. David Walter Maggi, dated April 17, 2008.

2.  Expert Reports:

    (a) Norman V. Johanson, dated June 10 2008,

    (b) Estelle L. Davis, Ph.D., CRC, dated May 22, 2008,

    (c) Richard J. Lurito, Ph.D., dated May 30, 2008.

3.  Castle 200 Surgical Lighting System brochure.

4.  MDT Castle engineering drawings.

5.  Castle 2000 Series Surgical Lights Parts Manual.

6.  Castle 2000 Series Surgical Lights Installation Manual.

7.  Castle 2000 Series Surgical Lights Service Manual.

8.  Getinge service records.

9.  Getinge Maintenance Contract.

10. Photographs of the accident scene by others.

11. Dr. Scruggs medical records.

12. Complaint and Pleadings.

Additionally, on May 1, 2008, CED inspected operating room No. 8 at Howard University Hospital located on Georgia Avenue in Washington, D. C.  The inspection was documented with notes, measurements, photographs and video.

CED INVESTIGATIVE TECHNOLOGIES, INC.

Page 3  Scruggs v. Getinge USA Investigation - CED Case No. 7154.1

**Deposition of Phillip Sax**  This document revealed the following information:

- Senior Director of Regulatory Affairs & Quality Assurance for Maquet, Inc. Getinge corporate designee.

- Light fixture involved in Dr. Scruggs' accident was manufactured by MDT Castle; company was subsequently purchased by Getinge.  Maquet, Inc. took responsibility for the surgical light product line in January 2008.

- Regarding Getinge's response to Dr. Scruggs' accident: "What was done is that three people were dispatched to the hospital to see what transpired, to look at the light itself, to interview the people, look at the fittings in the ceiling, whatever was relevant.  And as I understand it, they were all technical people, too, who were familiar with the product line" (Sax deposition – page 23).

- Names of the three people sent to the hospital to investigate: Mr. David Clauss, Mr. David Maggi, and Mr. Adams.

- Regarding what was found as a result of the investigation: "As far as I know. What they did was they explained that the light had fallen as a result of a - - of it being turned, and that a pin that was supposed to be there in installation wasn't in place, and the pin would have prevented it from falling" (Sax deposition – page 24).

- Regarding installation records for the light fixture:

  Q: "Did you look for any information as to who installed the light that fell?"

  A: "Based upon the information and conversations with her attorney, we tried to find that answer, and that came - - work was done in

**CED INVESTIGATIVE TECHNOLOGIES, INC.**

**Page 4  Scruggs v. Getinge USA Investigation - CED Case No. 7154.1**

Charleston (South Carolina) to try to find if there was any information related to how that was done, that investigation there, the information, looked through the documents, and there's no information on it. We're not able to find anything?"

Q: "Did you instruct people to look?"

A: "Yes."

Q: "Who did you instruct to look?"

A: "The two people I mentioned earlier, John Clay and Jamie Yieh, and the person who was resident in Charleston at the time, Chris Mannarino."

Q: "Chris Mannarino?"

A: "Yes."

Q: "And what's happening in Charleston?  Why Charleston?"

A: "Charleston is where the light was originally manufactured that was originally a Castle location.  And so anything related to the actual manufacturing of that product would have been there." (Sax deposition – pages 50 and 51).

**Deposition of David Clauss**  This document revealed the following information:

- Currently service manager for Getinge.
- Wrote up an incident report as a result of a service call at Howard.
- Regarding the installation:

    Q: "Do you have any information that identifies when it was installed?"

    A: "No, sir."

Page 5  Scruggs v. Getinge USA Investigation - CED Case No. 7154.1

> Q: "Did you look at that issue?  I mean look at the documents with a view towards that?"
>
> A: "I looked at the available documentation, which there is none, that Getinge or MDT installed the light."
>
> Q: "Well, that's a different question.  I'm asking when it was installed."
>
> A: "I can't answer that."
>
> Q: "And you don't know one way or another who installed the light?"
>
> A: "I have no knowledge of that." (Clauss deposition – page 25).

- Inspected the light on January 29, 2006.  Regarding what he saw: "I found the lamp head on the floor and as we investigated it, we found that the retaining pin, locking pin, that should have been drilled in during installation, had not been placed in, causing the light to back out" (Clausss deposition – page 43).

- A failure to set the rolling pin during installation permitted the light fixture to unscrew and then fall.

- Regarding problems with the installation:

> Q: "In terms of the installation, if the product, the surgical light, was unscrewing itself, how would that be realized by the user of the product?"
>
> A: "Initially, it probably wouldn't be.  Until it got very close to the end, and then it made - - the light may have started to move or there would have been drift of the extension arms, a reflection of losing that inch or two of thread.  I would think that you might have some movement of the arm" (Clauss deposition – page 60).

- Continuing regarding installation problems:

Q: "And so in terms of the proper installation of lights and if it's improperly installed, such that it's backing itself out, at some point you're saying a likely byproduct of backing itself out might be extension arm drift; is that right? Sir? You started to shake your head yes. Is that right?"

A: "Is it possible? Yes."

Q: "It's not unlikely, is it? It's not something that's so totally unlikely it's not even on your - -"

A: "Again, it's never occurred, so I can't answer that. I've never seen this happen before, so I can't answer the - - with any certainty. I can't answer the question."

Q: "You've never seen what before?"

A: "I've never seen a light come out like this one, so I can't give you - - I can't tell you what would happen if it backed out three-quarters of the way. I have no experience in that" (Clauss deposition – pages 61 and 62).

**Deposition of David Walter Maggi**    This document revealed the following information:

- Senior service representative for Getinge since January 1, 2006.

- Was called by Mr. Clauss to inspect the light after Dr. Scruggs' accident.

- Regarding his inspection of the light fixture: "The light was on the floor. Obviously, then I looked at the suspension tube. From what I recall, you couldn't see where the pin is on the suspension tube, because the ceiling was

installed below where the pin is.  So I was on a ladder and I believe - - I thought, you know, we could put stuff up on the ceiling to look and see where the pin was.  But the suspension tube comes pre-drilled and that hole was there, but there was no pin, obviously" (Maggi deposition – page 25).

- Does not know who installed the light fixture.

- The suspension arm/post is the female end and has a pre-drilled hole.  The extension arm is the male and required a hole to be drilled during installation of the light fixture.

- Regarding assembling the light fixture: "You go all the way up intil it's tight, and then you take a quarter inch drill bit and drill – you already have a hole in the suspension tube and you're drilling thought the post" Maggi deposition – page 42).

**Report of Norman V. Johanson**  This document revealed the following information:

- Opined: "The subject MDT/Castle/Getinge Surgical Light fixture was negligently and defectively installed without a pin or other means of preventing rotation of the treaded extension arm post within a ceiling mounting plate" (Johanson report – page 8).

- Opined: "The subject MDT/Castle/Getinge Sugical Light fixture was negligently designed and defective in a manner that required field preparation [drilling], assembly of three components [Mounting Plate, extension arm post, and groove pin] in a specific manner (Johanson report – page 8).

Page 8  Scruggs v. Getinge USA Investigation - CED Case No. 7154.1

- Opined: "Had the subject Surgical Light been designed with an extension arm assembly pre-attached to the mounting plate instead of requiring field preparation and assembly, the Surgical Light components could not have loosened, unscrewed, fallen, or injured Dr. Scruggs" (Johanson report – page 8).

- The manual failed to provide a hazard warning relating to loosening of the light fixture.

- Opined: "MDT/Castle/Getinge failed to provide warnings or instructional labels or other markings directly on the surgical light's extension arm post or mounting plate. Had appropriate warnings or instructions been placed directly on the component parts that MUST be locked together to render the assembly safe, the assemblers of the Surgical Light would likely have complied, the components would not have unscrewed, and Dr. Scruggs would not have been injured" (Johanson report – page 9).

- Opined: "MDT/Castle/Getinge personnel frequently serviced the Surgical Light but failed to examine or test it for foreseeable safety hazards such as unthreading of the connection between the extension arms and the mounting plate, a connection that reported "drift" conditions should have made apparent" (Johanson report – page 9).

**Castle 2000 Series Surgical Light Installation Manual** This document revealed the following information:

- Discussed the installation steps for attaching the extension arms to the mounting plate. Photographs taken subsequent to the accident indicated that

CED INVESTIGATIVE TECHNOLOGIES, INC.

the light fixture involved in Dr. Scruggs' accident did not come with a suspension tube (Attachment A – Photograph 1).

- Page 2-5 of the Installation Instructions showed a depiction of the extension arms and labeled the extension arms and the extension arm post (Attachment B – Figure 1).

- Page 2-6 of the Installation Instructions (Figure 2), step No. 4 stated: "Thread the mounting plate/suspension tube onto the extension arm post, holding the wire bundle to prevent the wires from twisting while attaching the plate".

- The next step, sequentially, on page 2-6 of the Installation Instructions discussed securing the mounting plate to the ceiling.  Step No. 4 of these procedures stated: "Using the wrench provided, tighten the extension arm post into the mounting plate.  Tap the wrench with a mallet to seat the assembly firmly".

- The next sequential step, in order, discussed: (1) leveling of the extension arms, and (2) pinning the extension arm assembly.  These steps were discussed on page 2-7 (Figure 3).

- The instructions for pinning the extension arm assembly, Step No. 1, stated: "Locate the pre-drilled ¼" (6.4 mm) diameter hole in the suspension tube (or ceiling mounting plate if a suspension tube is not used).  Using a ¼" (6.4 mm) drill with a stop (see caution note above), extend the hole through the wall of the threaded center post of the extension arm assembly".

- The instructions for pinning the extension arm assembly, Step No. 2, stated: "Using the ¼" (6.4 mm) diameter, 1" (25.4 mm) long groove pin supplied, pin the extension arm post to the suspension tube (or ceiling mounting plate).

Drive the pin into the drilled hole, grooved end outward, until the end of the pin is flush with the surface of the suspension tube (or ceiling mounting plate)."

**Getinge Serice Records**  These documents revealed the following information:

- April 24, 2006: Service Call Report No. 060179670187, Model L2031, Serial No. JKM85115 - "Ck/Lens and drift".
- April 27, 2006: Service Call Report No. 060179670194, Model L2031, Serial No. JKM85115 – "Adjust drift clean lens".

**Howard University Hospital Operating Room Inspection**

On May 1, 2008 CED inspected operating room No. 8 (OR8) at Howard University Hospital located on Georgia Avenue in Washington, D. C. The inspection was documented with notes, measurements, photographs and video.  At the time of the CED inspection, a single mount three-source Getinge lighting fixture was installed inside OR8.   Additionally, another light fixture mounting plate was partially exposed and attached to the ceiling joist (Photograph 2).  When compared to photographs taken subsequent to Dr. Scruggs' accident (Photograph 1), CED determined that the partially exposed ceiling mounting plate was the former location of the light fixture that was involved in this accident.

CED inspected the partially exposed ceiling mounting plate that was involved in Dr. Scruggs' accident and located the pre-drilled hole in the mounting plate

Page 11  Scruggs v. Getinge USA Investigation - CED Case No. 7154.1

(Photograph 3).  There was no evidence that a groove pin had ever been installed in the pre-drilled hole in the mounting plate (Photographs 4 and 5).

For comparison purpose, and with the permission of Howard, CED asked that the drywall ceiling be partially exposed in the vicinity of the second mounting plate (used for the single mount, three-source Getinge light) so that an inspection of the second mounting plate's pre-drilled holed could be accomplished (Photograph 6). After partially exposing the mounting plate for the single mount three-source Getinge light, it was determined that a groove pin was not installed in the pre-drilled hole (Photographs 7 and 8).

CED rotated the single mount three-source Getinge light and determined that the extension arm post would not rotate when the Getinge light fixture was rotated through the fixture's entire range of motion.  A video was used to record the rotation of the single mount three-source Getinge light fixture.

## Discussion

The Getinge light fixture involved in Dr. Scruggs' accident was improperly installed since no groove pin had been installed in the mounting plate of the single mount, double extension arm, three-source lighting fixture.  Based on CED's inspection of the mounting plate involved in Dr. Scruggs' accident, the paint system on the pre-drilled hole in the mounting plate was undisturbed.  Had a groove pin been installed in the mounting plate, the extension arm post of the double extension

CED INVESTIGATIVE TECHNOLOGIES, INC.

arm would not have been able to rotate and the light fixture would not have fallen on the day of Dr. Scruggs' accident.

It was not possible to determine which entity installed the light fixture involved in Dr. Scruggs' accident since no record exists to document the installation. Mr. Sax, Getinge Director of Regulatory Affairs & Quality Assurance, testified that he asked Getinge employees to look for specific information and/or records that could document the light fixture's installer; no installation records were found. Mr. Clauss, Getinge service manager, testified that he found no records to document the light fixture's installer. Additionally, Mr. Maggi, Getinge service representative, testified that he did not know who installed the light fixture. Typically, installation of manufactured systems and/or units would be documented as part of the initial contract or any supplemental changes to that contract, and the installation cost would be specified in contract documents. Based on the information reviewed by CED, it would be speculative to determine which entity installed the light fixture involved in Dr. Scruggs' accident.

There was no evidence that extension arm drift was the cause of Dr. Scruggs' accident. It has been suggested that extension arm drift would have alerted Getinge maintenance personnel that the fixture's extension arm post was unscrewing from the ceiling at the hospital. Based on the material reviewed by CED, there was no evidence that drift reported on April 24, 2006 or April 27, 2006 was in any way related to Dr. Scruggs' accident on August 29, 2006, or that the maintenance conducted on those two dates was not sufficient to ensure continued service of the

**Page 13  Scruggs v. Getinge USA Investigation - CED Case No. 7154.1**

light fixture between the time of the maintenance and the day of Dr. Scruggs' accident.  When questioned about the relationship between drift and the ability of a light fixture to fall from the mounting plate, Mr. Clauss testified that the light may have started to move when the extension arm post thread engagement with the mounting plate was close to the end. "Initially, it probably wouldn't be.  Until it got very close to the end, and then it made - - the light may have started to move or there would have been drift of the extension arms, a reflection of losing that inch or two of thread.  I would think that you might have some movement of the arm" (Clauss deposition – page 60).  However, Mr. Clauss testified that separation of the extension arm post from the mounting plate had never occurred and that he could not answer such a question. "Again, it's never occurred, so I can't answer that.  I've never seen this happen before, so I can't answer the - - with any certainty.  I can't answer the question" (Clauss deposition – pages 61 and 62).  No testing has been presented by the plaintiff to document the relationship between drift and the loss of thread engagement between the light fixture's extension arm post and the mounting plate. In the absence of such testing, and based on the material reviewed by CED, it would be speculative to suggest that a maintenance call approximately four months prior to Dr. Scruggs' accident was directly related to the accident.

The Getinge light was not defectively designed because of the necessity to perform field preparation and assembly.  Based on CED's review of the light fixture's installation instructions, a series of four simple sequential steps were described and illustrated in Getinge's installation manual: (1) thread the mounting plate onto the extension arm post, (2) install the mounting plate in the ceiling, (3) tighten the

extension arm post into the mounting plate using a wrench that was provided, and (4) install a groove pin to properly anchor the extension arm post to the mounting plate.    If followed, these simple four sequential steps would have prevented Dr. Scruggs' accident.  There was nothing unreasonable about these four installation steps.    The steps were not difficult to perform, the steps were not difficult to understand, and appropriate tools and/or parts were provided with the light fixture to successfully accomplish the steps.

The Getinge manual was appropriate and adequately described the steps needed to successfully and safely install the light fixture involved in Dr. Scruggs' accident.  The Getinge installation manual discussed sequential steps to follow to completely install the light fixture (Figures 1 through 3).  These sequential steps were illustrated with depictions that clearly and unambiguously defined various components of the lighting system.  As discussed above, the sequential steps were easy to understand and perform.  Additionally a wrench was provided to tighten the extension arm post to the mounting plate.  After tightening the extension arm post to the mounting plate, and after ensuring that the extension arms were level, the next illustrated sequential step was to install a supplied groove pin.  It would have been difficult to somehow not see the groove pin installation instructions that comprised approximately three quarters of a page in the sequential installation instructions.  At the very least, the installer should have been curious, at the end of the installation, as to why the supplied groove pin was left over and then to inquire about the purpose of that groove pin.  It has been suggested that the installation instructions for pinning the extension arm post to the mounting plate were misleading and confusing.  Such a

Page 15  Scruggs v. Getinge USA Investigation - CED Case No. 7154.1

suggestion has no merit.  Step No. 1 of the instructions for pinning the extension arm assembly stated: "Locate the pre-drilled ¼" (6.4 mm) diameter hole in the suspension tube (or ceiling mounting plate if a suspension tube is not used).  Using a ¼" (6.4 mm) drill with a stop (see caution note above), extend the hole through the wall of the threaded center post of the extension arm assembly".  Based on the photographs taken after Dr. Scruggs' accident, the extension arm of the light fixture involved in Dr. Scruggs' accident did not contain a suspension tube.  Anyone who attempted to install this light fixture would have known that this light fixture did not have a suspension tube.  The installation instructions clearly depicted and defined the extension arms, the extension arm post, the suspension tube and the mounting plate (Figures 1 through 3).  If one read the installation instructions one would have been able to understand the component parts of the light fixture.  Additionally, the installation instructions stated to locate a pre-drilled hole in the suspension tube or the mounting plate if a suspension tube was not used.  Given the illustrations and descriptions contained in Figures 1 through 3, it should have been clear how to properly insert the groove pin.  Based on the material reviewed by CED, the pinning instructions were neither misleading nor confusing.

The cause of Dr. Scruggs' accident was the improper installation of the light fixture in operating room eight at Howard University Hospital.  Proper instructions were provided in the installation manual to safety install the light fixture.  There was nothing unreasonable about the design of the light fixture.  Had the groove pin been properly inserted through the light fixture's mounting bracket and into the threaded

**Page 16  Scruggs v. Getinge USA Investigation – CED Case No. 7154.1**

extension arm post, Dr. Scruggs' accident would not have occurred.  The unknown installer was responsible for the insertion of the groove pin.

## Conclusions

Based on the review of written materials and the inspection of the operating room at Howard University Hospital, CED is able to conclude the following, to a reasonable degree of engineering certainty:

1. The Getinge light fixture involved in Dr. Scruggs' accident was improperly installed since no groove pin had been installed in the mounting plate of the single mount, double extension arm, three-source lighting fixture.

2. Had a groove pin been installed in the mounting plate, the extension arm post of the double extension arm would not have been able to rotate and the light fixture would not have fallen on the day of Dr. Scruggs' accident.

3. It was not possible to determine which entity installed the light fixture involved in Dr. Scruggs' accident since no record exists to document the installation.

4. There was no evidence that extension arm drift was the cause of Dr. Scruggs' accident.

5. The Getinge light was not defectively designed because of the necessity to perform field preparation and assembly.

6. The Getinge manual was appropriate and adequately described the steps needed to successfully and safely install the light fixture involved in Dr. Scruggs' accident.

**CED INVESTIGATIVE TECHNOLOGIES, INC.**

**Page 17  Scruggs v. Getinge USA Investigation - CED Case No. 7154.1**

7.  The cause of Dr. Scruggs' accident was the improper installation of the light fixture in operating room eight at Howard University Hospital.

CED reserves the right to amend this report following receipt of additional material.   If there are any questions about the content of this report, or if new information becomes available, please contact our offices.

Submitted by:                                          Reviewed by:

William H. Daley, III, P.E.                       Brian Pietryka, P.E.
Mechanical Engineer                               Civil Engineer

**CED INVESTIGATIVE TECHNOLOGIES, INC.**

**Scruggs v. Getinge USA Investigation - CED Case No. 7154.1**

# ATTACHMENT A

## Photographs

Scruggs v. Getinge USA Investigation - CED Case No. 7154.1



Photograph 1

Light Fixture Involved in Dr. Scruggs' Accident

Photograph Provided by Others

Scruggs v. Getinge USA Investigation - CED Case No. 7154.1



Photograph 2

Light Fixture Mounting Plate Involved in Dr. Sruggs' Accident Partially
Exposed at the Time of the CED Inspection

Scruggs v. Getinge USA Investigation - CED Case No. 7154.1



Photograph 3

Pre-drilled Hole in the Light Fixture Mounting Plate Involved in Dr. Sruggs'
Accident

Scruggs v. Getinge USA Investigation - CED Case No. 7154.1



Photograph 4

Pre-drilled Hole in the Light Fixture Mounting Plate Involved in Dr. Sruggs' Accident

Scruggs v. Getinge USA Investigation - CED Case No. 7154.1



**Photograph 5**

**Pre-drilled Hole in the Light Fixture Mounting Plate Involved in Dr. Sruggs'
Accident**

CED INVESTIGATIVE TECHNOLOGIES, INC.

Scruggs v. Getinge USA Investigation - CED Case No. 7154.1



Photograph 6

Drywall Being Removed from the Vicinity of the Second Mounting Plate in
Operating Room No. 8 at Howard University Hospital

Scruggs v. Getinge USA Investigation - CED Case No. 7154.1



**Photograph 7**

**Second Mounting Plate in Operating Room No. 8 at Howard University
Hospital after Drywall Removal**

Scruggs v. Getinge USA Investigation - CED Case No. 7154.1



Photograph 8

**Pre-drilled Hole in the Second Mounting Plate in Operating Room No. 8 at Howard University Hospital**

CED INVESTIGATIVE TECHNOLOGIES, INC.

**Scruggs v. Getinge USA Investigation - CED Case No. 7154.1**

# ATTACHMENT B

## Figures

Scruggs v. Getinge USA Investigation - CED Case No. 7154.1



LIGHTING SYSTEM WITHOUT TV ACCES-
SORY ARM
INSTALLATION CHECKLIST

Approximate Time Required: 1 to 1-1/2 hours

Number of Qualified Installers Required: 1

Number of Additional Personnel to Aid: 2

Special Tools Required:

• Special wrench (supplied)

• Mallet

• Power drill with 1/4" bit

• Level

ATTACHING THE MOUNTING PLATE/
SUSPENSION TUBE TO THE EXTENSION ARM
ASSEMBLY

**CAUTION** *To prevent damaging the extension arm assemblies by placing them directly on the hard floor, pad a section of the floor large enough to set the extension arms on after removing them from their packing cartons.*

1. Position the extension arms on the floor as shown below.



POSITIONING OF EXTENSION ARMS

2. Remove the mounting plate cover over the wire connection compartment.

3. Guide the fish wire down through the mounting plate/suspension tube, and pull the extension arm wires up through the tube and plate.

 *To avoid damaging the equipment, use two people to assemble the mounting plate/suspension tube to the extension arm assembly.*

 *Use care not to bind or cross thread the extension arm assembly.*

 *To prevent double extension arms from rotating, secure the two extension arms together. To protect the finish, wrap the extension arms with paper before strapping. Do not apply tape directly to the extension arms.*



SUSPENSION
TUBE

EXTENSION
ARMS

EXTENSION
ARM POST

ATTACHING THE MOUNTING PLATE/
SUSPENSION TUBE TO THE EXTENSION
ARM ASSEMBLY

Figure 1

Castle 2000 Series Surgical Light Installation Manual – Page 2-5

CED INVESTIGATIVE TECHNOLOGIES, INC.

Scruggs v. Getinge USA Investigation - CED Case No. 7154.1

**2000 SERIES SURGICAL LIGHTS**
**2. Mountings**

4. Thread the mounting plate/suspension tube onto the extension arm post, holding the wire bundle to prevent the wires from twisting while attaching the plate.

5. Fish wires through the opening in the mounting plate into the wire connection compartment.

**ATTACHING THE MOUNTING PLATE/EXTENSION ARM ASSEMBLY TO THE CEILING SUPPORT STRUCTURE**

 *To avoid damaging the equipment, use three people to assemble the mounting plate/extension arm assembly to the ceiling support.*

 *Leveling nuts, washers, lockwashers, and mounting nuts are to be provided by the customer. Sizes will depend upon the diameter and threads of the mounting studs.*



SECURING THE MOUNTING PLATE
TO THE CEILING SUPPORT STRUCTURE

1. Thread one nut onto each of the mounting studs. Thread to 1/4" (6.4 mm) below the structural mounting surface to allow for adjustment.

2. Position the mounting plate/extension arm assembly and flat washers over the mounting studs.

3. Secure the mounting plate with washers, lockwashers, and nuts.



SECURING EXTENSION ARMS

4. Using the wrench provided, tighten the extension arm post into the mounting plate. Tap the wrench with a mallet to seat the assembly firmly.

 *Store the wrench in a safe place for future use.*

2-6      DATE: 2/97   REPLACES: 0/00      350178

**Figure 2**

**Castle 2000 Series Surgical Light Installation Manual – Page 2-6**

CED INVESTIGATIVE TECHNOLOGIES, INC.

Scruggs v. Getinge USA Investigation - CED Case No. 7154.1

2000 SERIES SURGICAL LIGHTS
2. Mountings

**LEVELING AND ADJUSTING THE EXTENSION ARMS**



*Leveling of the mounting plate is critical. If the mounting plate is not level, drift adjustment will be difficult. A slight amount of sag (less than 1/2") of the extension arms is normal due to the weight of the lightheads. To prevent drift, any sag must be uniform throughout the complete rotation of the arms.*

1.  Check that each extension arm is level throughout its entire 360 degree rotation.

2.  If an extension arm is not level, adjust the mounting studs to level the mounting plate.



LEVELING

**PINNING THE EXTENSION ARM ASSEMBLY**



*To prevent damage to the wires in the extension arm assembly, tape or set a stop 1-1/8" (29 mm) from the tip of the drill bit if drilling through the suspension tube. If drilling through the mounting plate, set a stop 1-3/8" (35 mm) from the tip.*

*To prevent chips from contaminating the pivot bearings, secure a barrier (e.g., tape, paper toweling) around the suspension tube at the upper extension arm bearing before drilling.*



*Avoid use of drilling lubricant. If used, it MUST NOT be allowed to migrate into the extension arm bearings. A thick absorptive barrier, such as paper toweling, secured around the post below the drilling area is recommended. Thoroughly remove any lubricant residue from the post after drilling.*



PINNING THE EXTENSION ARM

1.  Locate the pre-drilled 1/4" (6.4 mm) diameter hole in the suspension tube (or ceiling mounting plate if a suspension tube is not used). Using a 1/4" (6.4 mm), drill with a stop (see caution note above), extend the hole through the wall of the threaded center post of the extension arm assembly.

2.  Using the 1/4" (6.4 mm) diameter, 1" (25.4 mm) long groove pin supplied, pin the extension arm post to the suspension tube (or ceiling mounting plate). Drive the pin into the drilled hole, grooved end outward, until the end of the pin is flush with the surface of the suspension tube (or ceiling mounting plate).

CONTINUE WITH "CONNECTING WIRES AT THE CEILING MOUNTING PLATE" ON PAGE 2-18.

---

**Figure 3**

**Castle 2000 Series Surgical Light Installation Manual – Page 2-7**

CED INVESTIGATIVE TECHNOLOGIES, INC.

B

**Paul Fedio, Ph.D.**
**Clinical Neuropsychology**
**9408 Raintree Road**
**Burke, Virginia 22015**

Telephone: (703) 426-7246
Telecopier: (703) 426-4223

# NEUROPSYCHOLOGICAL EVALUATION

26 August 2008

Name: Scruggs, Michangelo  Dr.
Date of Birth: 18 April 1974
Age:  34 years
Dates of Evaluation: 15 and 16 August 2008

## TESTS AND PROCEDURES

**Wechsler Adult Intelligence Scale (WAIS-III and WASI):**

| Intelligence Quotients | 2006 | 2007 | 2008 [WASI] | |
|---|---|---|---|---|
| Verbal IQ | 116 | 119 | 110 | [High Average Range] |
| Performance IQ | 102 | 117 | 95 | [Average - High Average Range] |

**Wechsler Memory Scale – Third Edition (WMS-III): Memory Indexes**

| Domains | Immediate | | | Delayed | | |
|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2006 | 2007 | 2008 |
| Auditory | 99 | 114 | 117 | 111 | 124 | 128 |
| Visual | 109 | 115 | 118 | 110 | 129 | 125 |
| Auditory Recognition | 110 | 100 | | 110 | 100 | 100 |
| Working Memory | | | 118 | | | |

California Verbal Learning (CVLT-II); Rey Osterrieth Figure; Consonant Trigrams; Neurobehavioral Functional Inventory [NFI-R]; Check List Head Injury; Rey 15; Beck Depression Inventory-II; Personality Assessment Inventory; Interview; Records' Review.

**OVERVIEW:  Dr. Scruggs did not encounter any psychoeducational or behavioral problems in tracking the classical developmental milestones.  He earned a Doctorate of Podiatric Medicine [D.P.M.] and was in his residency when he sustained a facial/head injury in 2006.  As a result of alleged medical and cognitive problems, he claims that he is unable to function as a clinical practitioner and, in turn, is currently employed on a full-time basis in an administrative position.**

**The present evaluation replicated the findings of Dr. Scruggs' neuropsychological study in 2007 and confirmed an impressive recovery, and with few cognitive exceptions, he is functioning at his pre-accident levels. A mild decline in memory and attention is most likely linked to stress, depression, and pain.  This latter cluster of symptoms, however, should not prevent him from resuming clinical activities. However, he identified ongoing pain and limited physical mobility as the primary impediments that prevent him from functioning as a clinician practitioner.**

**Overall, Dr. Scruggs' pain threshold appears to be very low, owing in part to psychological stress, anxiety and somatization traits. He focuses much energy on his discomfort and medical problems. Pain management/treatment and counseling would be very helpful in assisting him to acclimate to any residua of the accident and changes in life-style.**

**Background Information:** Dr. Scruggs did not encounter any lag in tracking the core developmental markers and did well academically. He graduated from the University City High School in 1992 and earned a Bachelor of Science [Biology] from Fisk University in 1996. He received a Doctorate of Podiatric Medicine [D.P.M.] in 2002 from the Ohio College of Podiatric Medicine and subsequently, completed his training in this specialty.

At the time of the accident in question [29 August 2006], Dr. Scruggs was Chief Podiatric Surgical Resident at Howard University Hospital and was assisting in an operative procedure. He moved an overhead lamp to better illuminate the surgical field and reported that about 3 to 4 minutes later, the lamp broke loose from the ceiling and struck a glancing blow to the right side of his face. He recalls that he was not knocked down or rendered unconscious but was startled and thrust off-balance. He felt pain in his face and back, and some visual blurriness. He was treated briefly in the operating room and then walked/took an elevator to Employee Health where his facial injury was treated; he also experienced some "GI distress...dry heaves". He was taken by wheelchair for MRI study of his head/spinal cord; the results reportedly were normal.

Following the accident, Dr. Scruggs remained out of work for about 2.5 weeks but then returned and completed his residency in January 2007. He reported that he was able to tolerate pain and mobility problems and satisfactorily complete his residency training. In fact, he was voted 'the top and outstanding resident of the year'. However, he qualified his recovery by adding that his supervisor may have assigned him fewer and less demanding duties as a result of his pain and slowed performance. When he was asked to identify his career goals, absent the accident, he stated that he would probably have joined a private practice and secured a part-time position with the V.A. He has not begun interviewing or making applications along these lines because of his injuries.

Please peruse the available medical records for more details about the accident and treatment modalities. In short review, Dr. Scruggs noted that he was physically active before the accident and continued in part after the accident with physical therapy and water aerobics, 3 to 4/week. At the time of the evaluation, he was not participating in any prescribed therapies or drug regimen.

Dr. Scruggs noted that in the past, he had authored *The Blood Thicker than Water,* published in 2001, and *The Men's Room,* published in 1999. These novels dealt with cultural, psychosocial and family issues related to gay behavior of African American males. An introductory notation in *The Men's Room* provides a biographical note that Dr. Scruggs was born in St. Louis and grew up in University City. He made his literary debut with *The Men's Room* and matriculated at Fisk University where he was a member of the Fisk Jubilee Singers. He graduated with a B.S. Degree [Biology] and returned to St. Louis where he worked for an AIDS service organization and taught first grade before earning his doctoral degree.

From a medical perspective, Dr. Scruggs' history is unremarkable and there is no evidence of any neuropsychiatric disorder. He denies having sustained any head injury or having abused alcohol/drugs; he is not a cigarette smoker. With regard to the trauma in question, there is no evidence that an anterograde or retrograde amnesia had enveloped the trauma. He was also treated at the Washington Medical Group, where he underwent a comprehensive neuropsychological evaluation by Dr. Southworth on 10 and 15 November 2006, about 2.5 months after the accident. These results were interpreted as showing losses "in several areas of cognitive functioning compared to the level of ability he appears to have had before his accident". A mild impairment was noted in cognitive processing, visual spatial skills, response inhibition, and in focused attention to both auditory and visual stimuli. Dr. Scruggs also reported that he was having difficulty with executive functions, that is, initiating activities, in working memory and with multitasking. There was a mild reactive depression that was untreated. Neurocognitive rehabilitation and biofeedback therapies were recommended and offered at the Washington Medical Group.

Dr. Scruggs was also reevaluated one year later by Dr. Southworth [8/29 and 9/72007] or about 1 year ago. These test data were contrasted with his earlier performance in 2006 and showed that Dr. Scruggs had made significant gains to baseline levels but still struggled with isolated pockets of dysfunctioning. His auditory visual memory, visual attention, working memory, and visual spatial skills were much improved and he performed much better in auditory sustained attention and scanning. However, he showed mild deficits in information processing. The diagnostic impression generated by both evaluations aligned his performance with the effects of a concussion, no loss of consciousness and a cognitive disorder (NOS [not otherwise specified]). Overall, his mindset and test results did not generate any evidence that he was malingering or withholding effort.

**Intelligence:** Dr. Scruggs was evaluated at yearly intervals in 2006, 2007, and currently [2008], and at each time, his cognitive performance placed above average. His verbal intelligence [VIQ] across this time span held steadily within the high average range [116, 119, and 110; Fig. 1]. The present examiner and test results agree with the former interpretation that his VIQ and language skills returned to baseline levels, and overall, there was no major slippage in verbal proficiency. However, his performance intelligence quotient [PIQ], psychomotor speed and perceptual accuracy were viewed over time as less stable: PIQ=102, 117 and currently, 95, respectively. A caveat has to be offered here because his present PIQ was derived from an abbreviated scale of intelligence [WASI]. By the same token, it is possible that if he had been evaluated before the accident in question, his visuomotor skill may have been less well developed than his verbal abilities.

**Memory:** Figure 2 provides a good overview of Dr. Scruggs' test indexes on the Wechsler Memory Scale in 2006, 2007, and presently. Dr. Southworth noted correctly in her 2007 report, that there was a global improvement in both immediate and delayed auditory and visual memory. The same gains and stability carried forward into the present evaluation. What is very interesting to note in the test results of 2007 and 2008 (Figure 2) is that his memory actually improves after a delay interval and reflects excellent storage and retrieval of information in memory registers; this forte probably is applied in his current job setting. Overall, this memory pattern is not typical in concussive injuries and speaks favorably to his ability to learn and apply new or unfamiliar information at pre-accident levels.

Overall, there appear to be no major discrepancies between his ability to remember visual spatial vs. auditory verbal information. What is puzzling, however, is that his recognition memory score declined between evaluations in 2006 and 2007 and is holding at the same level in 2008. This is an unusual pattern but is not uncommon for individuals who tend to be anxious and detail oriented, and overwhelmed when confronted by multiple choices. It should be also noted that the Wechsler Memory Scale-III was presented a third time to Dr. Scruggs.

Dr. Scruggs performance on the California Verbal Learning Test (CVLT-II) was erratic but ended on a positive note (Fig 3). At the last learning trail, he performed as well as an average subject in learning a list of 16 words. What are also notable is that he did not have any major problems in learning a second or new list of words and that his recall for the original test word was excellent after a delay. Again, he tended to do better after a delay, which argues against a pattern of accelerated forgetfulness that is commonly seen in concussion, and traumatically brain injured patients. Instead, his profile implicates psychological and physiological factors such as anxiety and pain as the primary and treatable sources. Relatedly, Dr. Scruggs stood and walked several times during the present evaluation to relieve discomfort.

**Processing Speed:** The former evaluations noted that his processing speed was only average and was probably below baseline estimates. In 2006 and 2007, his index scores for processing speed were 93 and 99, respectively and currently 91 [27th percentile]. This confirms that Dr. Scruggs may be somewhat slow in scanning and integrating visual information, but he was not inaccurate. The question, however, is whether or not this is symptomatic of a concussion or more likely, the effects of pain, anxiety, and depression, which can be responsive to treatment and improve functioning.

**Attention/Executive Functioning:** Past references spoke to a short attention span, which was not clearly evident in the present evaluation. For example, his performance on a Post-Distractional Memory Test [consonant trigrams] was superb. In this case, when he was asked to recall 3 letters after counting backwards for different delay intervals, his performance was excellent and he did not make a single error. Although the past

evaluation did not report indices of working memory, the current evaluation showed that his working memory exceeded the average range [Index=118; Fig 2]. This indicates that he can do multitasking well, and hold and manipulate different chunks of information in mind at the same.

Dr. Scruggs was administered an a reaction time paradigm where he had to press, hold and quickly release a key at the delivery of an auditory signal after foreperiods of 2, 4, and 10 seconds. Overall, his reaction time or speed ranged between 200 to 300 msec., which placed within the low average range. And, when the 2, 4 and 10 foreperiods were randomly mixed, his reaction times remained stable and in the low average range. Overall, there appears to be no significant deficit in his ability to hold/maintain attention over time and to shift from one preparatory set to another.

**Perceptuomotor Coordination:** Although this represents a third administration of the Rey Figure where Dr. Scruggs had to simply copy a complex design, there were some errors, albeit, not related to perceptual problems, but to impulsivity in completing the task. Overall, he was average in solving visual matrices and in assembling blocks to match visual templates.

**Emotions:** Dr. Scruggs' self-concept vacillates from pessimism and self-doubt to the opposite axis of confidence and positive self-esteem. Under stress, he is very prone to become self-critical, uncertain, and indecisive which provokes physiological stress and amplifies his pain. Overall, his psychological profile was essentially normal with the exception of some of the aforementioned traits and a preoccupation with somatic status and health. He rivets on pain and limited mobility and fleeting thoughts about the accident. He reports an occasional nightmare about the accident trauma.

Dr. Scruggs responses to the Neurobehavioral Functional Inventory [NFI-R]confirmed his concern about somatic problems, especially pain and motor limitations. He did not overly endorse questions about depression, memory failures, or problems in communication and dealing with aggression. There was, however, an emphasis on health issues, pain in his back and legs, which he aligns with spinal cord injury. Relatedly, he feels that he is unable

to stand or sit for long periods of time without moving, and is unable to lift and carry heavy objects or move quickly and decisively. From an emotional perspective, there is a fixation on pain that redirects resources from constructive usage while increasing his risk for maladaptive behavior.

Dr. Scruggs' test profile on the Personality Assessment Inventory (PAI) noted mild or transient depressive symptoms that relate to physical complaints. He faults his medical problems for disturbances in sleep, anergia, anhedonia, as well as a loss of appetite and weight change. There is a consuming concern about well-being and health matters, and focus on headaches and gastrointestinal problems. In short, there was no evidence from the interview or personality assessments to suspect that Dr. Scruggs harbors any intent or plan for self-harm or suicidality.

**SUMMARY AND RECOMMENDATIONS:** Dr. Scruggs sustained a facial/head injury when an operating room lamp broke loose from the ceiling and struck him over the right facial region about 2 years ago [29 August 2006]. He was dazed and in pain, nauseous, dizzy, and developed headaches. No significant retrograde or anterior grade amnesia for the accident is evident. Neuroimaging did not reveal any intracranial insult.

Dr. Scruggs was evaluated neuropsychologically shortly after the trauma [2006] and showed a decline in memory, attention, and other cognitive domains. However, he received cognitive training and when he was reevaluated one year later in 2007, he showed a remarkable improvement and recovery of cognitive functions to baseline levels. The current evaluation essentially followed the same assessment track and replicated the findings reported in 2007. The data show that Dr. Scruggs continues to perform at high average to superior cognitive levels in learning and remembering auditory verbal and visual non-verbal material, immediately after presentation and after a delay. There is no past or present evidence that Dr. Scruggs was malingering, withholding effort. Overall, he clearly commands the necessary cognitive resources and abilities to resume services as a clinical practitioner.

Dismissing malingering as a potential explanation of his cognitive complaints, one must still deal with the fact that Dr. Scruggs displays physical discomfort and pain, which is outside the realm of this evaluation. From a cognitive perspective, however, his changes are relatively minor and probably relate to the effects of his physical and psychological symptoms.

Overall, Dr. Scruggs has acclimated well and made some career adjustments to accept employment in an administrative position. Nonetheless, he maintains that he has had to abandon his original goal and career as a clinical practitioner, owing to pain and mobility problems. Here, he needs to be evaluated and treated by a specialist.

Finally, since there is a robust psychological component to Dr. Scrugg's dysfunctioning, demands psychotherapy during this time of adjustment and judicious use of medication. This treatment protocol would help him to reevaluate his station and goals in life, while protecting the dignity and quality of his life. In sum, Dr. Scruggs' major impediment to resume a clinical practice at this time relates to orthopedics and psychological issues, and not to cognition, per se. Prognosis remains favorable but is linked to psychological counseling and pain treatment.

Paul Fedio, Ph.D.
Clinical Neuropsychologist



Fig. 1  Wechsler Intelligence Scales



Fig 2. Wechsler Memory Scale-III [WMS-III]



Fig 3. California Verbal Learning Test [CVLT-II]

C

**Paul Fedio, Ph.D.**
**Clinical Neuropsychology**
**9408 Raintree Road**
**Burke, Virginia 22015**

Telephone: (703) 426-7246
Telecopier: (703) 426-4223

## Expert Witness Fee Schedule:

### File Review and Preparation
$400/hr to discuss case with attorney
$400/hr to review files and materials

### Neuropsychological Examination and Report:
$400/hr to interview patient and others; administer and score test results;
draft, review and submit report.

### Depositions:
$400/hr with a minimum charge for 3 hrs
preparation–extra hourly charge of $400/hr.

Cancellation: full fee if not cancelled 48 hrs prior to scheduled deposition time.

### Trials:
$400/hr with a minimum charge for 5 hrs; preparation-extra hourly charge.
preparation–extra hourly charge of $400/hr.

Cancellation: full fee if not cancelled 48 hrs prior to scheduled trial time.

### Travel:
Portal-to-Portal: $150/hr for evaluations or meetings if distance exceeds
30 miles [one way]

**No retainer fee or advance payment required for examination,
depositions or trial**

D

# LOUIS E. LEVITT, M.D., C.I.M.E.
# MARC B. DANZIGER, M.D.
# MARK J. SCHEER, M.D.
### PRACTICE LIMITED TO ORTHOPAEDIC SURGERY & MEDICINE
1850 M St., N.W.-Suite750 -Washington, D.C. 20036-(202) 835-2222- Facsimile (202) 969-1798


## History of Depositions and Court Appearances Louis E. Levitt, M.D.

### 2004

3/4/2004 Telephone Deposition- Finch, Michelle - Atty: Jim Haley
3/25/2004 Deposition- Williams, M.D., Ann - Atty: Joyce Notarius
4/15/2004 Deposition- Robinson, Rudolph - Atty: Joan Adelman
5/20/2004 Deposition- Walker, Carroll - Atty: Kevin O'Connell
7/29/2004 Deposition- Williams, Jessie - Atty: WMATA general counsel
8/5/2004 Deposition- Hughes, Sidnice - Atty: Alan Carlowe
8/25/2004 Deposition-Payden, George – Atty: Patrick Cullen
10/14/2004 Deposition- Crumblin, Ronald- Atty: Godwin  & Hickey
12/2/2004 Deposition- Shipman, Susan- Atty: Anthony Zaccagnini

### 2005

03/9/2005 Deposition- Duvall, Bryan- Atty: John Kearns
3/14/2005 Deposition- Monroe, Fannie- Atty: Steve Mones
4/7/2005 Deposition- Harrison, Sandra- Atty: Robin Haustmann
6/2/2005 Deposition- Locke, Kenzie- Atty: Walter Gilchrist
6/30/2005 Deposition- Gilbert, Tammy- Atty: Semes, Bowen & Semes
7/7/2005 Deposition- Mercilliot, Mitchell- Atty: Herwig & Humphries
8/25/2005 Deposition- Diaz-Delvalle, Jose- Atty: Robin Haustmann
11/01/2005 Deposition- Presley, Charles- Atty:?,O'Brien
11/15/2005 Deposition- Cooper, Marvin- Atty: William Shipman
11/29/2005 Deposition- Butler, Kathleen- Atty: Allen Carlo

### 2006

2/6/2006 Deposition- Henderson, Linda- Atty: WMATA General Counsel
2/13/2006 Deposition- Fry, Darlene- Atty: John Sheldon
3/28/2006 Deposition- Applewhite, Marvia- Atty: Mike Levin
8/82006 Deposition- Littleton, Anne- Atty: Semes, Bowen & Semes
8/15/2006 Deposition- Hawkes, Thomas- Atty: WMATA General Counsel
8/22/2006 Deposition- Beatley, Peggy- Atty: Chubb Ins.
10/16/2006 Deposition- Hamton-Johnson, Jacqueline- Atty: Guido Pocarelli
11/6/2006 Deposition- Wells, Kenneth- Atty: Hartford Ins
12/4/2006 Trial Appearance- Pressley, Charles Atty: Steve Schwinn

# LOUIS E. LEVITT, M.D., C.I.M.E.
## MARC B. DANZIGER, M.D.
### MARK J. SCHEER, M.D.
PRACTICE LIMITED TO ORTHOPAEDIC SURGERY & MEDICINE
1850 M St., N.W.-Suite750 -Washington, D.C. 20036-(202) 835-2222- Facsimile (202) 969-1798

## History of Depositions and Court Appearances Louis E. Levitt, M.D.

### 2007

2/12/2007 Deposition- Boyd, Mataw
2/15/2007 Deposition- Thompson, Ronald- Atty: WMATA General Counsel
3/5/2007 Deposition- McGhee, Annie
8/20/2007 Deposition- Scotchel, Michael
10/1/2007 Deposition- Cutter, Vera
10/8/2007 Deposition- Nueberger, Jack
12/6/2007 Deposition- Strickland, Yolanda

### 2008

7/24/2008 Deposition- Farrar, Edison- Atty: Michael Daney
8/7/2008 Deposition- Burrows, Ronald